## Jacobs's Estate.

*Wills—Probate—Undue influence—Testamentary capacity—Devisavit vel non—Solicitations.*

1. The fact that a residuary legatee sought financial assistance in letters addressed to testatrix is unimportant as showing undue influence; and especially is this so if he did not solicit decedent to make a will in his favor.

2. Mere peculiarities of mind, eccentricities, religious enthusiasm or general hobbies are not sufficient to avoid a will.

3. The fact that a testatrix chose to make a will in favor of friends in whom she was deeply interested, to the exclusion of a sister and other relations, does not render her will invalid.

4. Under the testimony in this case, the court found that the contestant had failed to establish testamentary incapacity or undue influence.

Exceptions to decree dismissing appeal from register. O. C. Phila. Co., Oct. T., 1926, No. 3235.

STEARNE, J., Auditing Judge.—This is an appeal from the decision of the register of wills admitting to probate a certain paper writing, dated June 18, 1926, as the last will and testament of the decedent.

The estate consists, according to the petition for letters, of personal property to the value of $5000 and no real estate.

The will in question gives the entire estate unto two individuals, strangers in blood. Contestant is a sister. The allegations in the petition are that decedent left the following heirs and next of kin: Petitioner (sister of decedent), three children, being nephews and nieces (children of a deceased brother) and a niece (daughter of another deceased brother), all of whom, by citation, were made parties to these proceedings.

The petition charges that, at the time of the execution of the will, decedent was in such a condition of mind and health, because of her age, sickness and infirmity, that she was incapable of intelligently disposing of her estate, and that the will was procured by undue influence practiced upon her by Platt D. Smith and Mack G. Britton, the two persons named as residuary legatees. An issue is asked to try the following questions of fact: First, whether or not, at the time of the execution of the said writing, decedent was a person of sound mind; second, whether or not the said writing was procured by the use of undue influence practiced upon the decedent by said Platt D. Smith and Mack G. Britton; and, third, whether or not the said writing is the proper will of the said decedent. Answers were filed by the executrix mentioned in the will and by the two residuary legatees, denying all material allegations of the petition. A replication was filed and a hearing was duly had before me on Oct. 24 and 25, 1927.

At the conclusion of the testimony, counsel for contestant withdrew the contest as to Platt D. Smith, but insisted upon pressing the contest against Mack G. Britton. As the facts of the case are so intertwined about both of these individuals, it is impossible to determine the issue without a consideration of the entire testimony.

Mary F. Jacobs, the decedent, was a widow, and, according to contestant, who was her sister, she was eighty-one years of age at the time of her decease. It appears that she was of Quaker stock and was extremely careful and frugal with respect to financial matters. The income from her very small investments was her sole support; to produce the highest income, the principal required skillful and careful handling, and in this she was ably assisted by a Mr. John Murray, who was a nephew by marriage. Mr. Murray made her investments wisely, which enabled the decedent to obtain the greatest possible benefit from its use; she lived in Philadelphia in a rooming-house,

where she attended to her affairs down to the date of her last illness; so careful of money was she that, in the opinion of the keepers of the rooming-house, decedent frequently failed to adequately supply herself with sufficient nourishing food; her personal habits, however, were clean and orderly, and, down almost to the date of her death, decedent assisted the mistress of the rooming-house in housekeeping matters, such as making the beds, and the performance of other household duties; she was a woman of very strong will and had decided ideas of her own.

The contestant lived at Columbia, Pennsylvania, and on occasions the decedent would visit her sister, but these visits ceased for some years before her death because of matters hereinafter referred to.

The decedent was most religiously inclined. Her chief pleasure appeared to be in her attention to church matters, revolving about the Centennary Methodist Church, at 41st and Spring Garden Streets, Philadelphia. She attended church services and prayer meetings regularly and generally was very active in church matters to the time of her decease.

About nine years prior to her death, the decedent met a Mrs. Blanche Hess, who was interested in an organization known as the Home Service League, which apparently was organized for the purpose of conducting meetings at various homes for religious and moral instruction to sailors and marines in the United States service. A Mr. Charles Butler was then the leader of the league and brought service men to the different homes for this purpose. Decedent became very vitally interested in this work, and her interest was well known to all of her relatives and acquaintances. From the testimony it clearly appears that she assumed the duty of "mothering" these young men and of looking after and advising them concerning their personal and private affairs. As time went on, her affections seemed to centre upon one of the boys by the name of Virgil Aurand, and subsequently upon Platt D. Smith (one of the residuary legatees herein). Apparently, Virgil Aurand disappointed the decedent, in that he borrowed $500 from her, which he failed to repay. This annoyed and disturbed the decedent exceedingly. There was evidence she had written numerous letters to Aurand protesting against his lack of consideration, because he was well aware of her meagre financial situation, and that, after receiving the loan, he had apparently lost all interest in and contact with the decedent. It is shown that she prayed for him, and, at one time at least, expressed a wish that he should be punished for the wrong which he had done her and for the abuse of her confidence. Among the service men, decedent was known as "Mother Jacobs." Her reputation as one sincerely interested in the welfare of sailors and service men was known in many parts of the country. In January, 1917, Platt D. Smith, a master mechanic in the Navy, stationed at Boston, Mass., met the Mr. Butler hereinbefore referred to at the Y. M. C. A. in Boston. When Butler learned that Smith was coming to Philadelphia, he advised him to become acquainted with "Mother Jacobs;" when Smith came to Philadelphia, he attended a meeting of the Home Service League at the home of a Miss Rankin in West Philadelphia, where there were about eighteen other service men present. At this meeting, for the first time, he met the decedent; he acquainted her with the recommendation of Mr. Butler, and after that meeting the acquaintanceship ripened into a sincere attachment of both parties. Decedent came to assume the attitude of a mother towards Smith; Smith brought his fiancee to meet the decedent, who advised them concerning such matters as securing a home and for the future planning of Smith's life-work, his education and self-advancement. Very many letters were written between them, all of the most

intimate and affectionate nature, and were such letters that might well pass between a mother and her own son. This close and intimate relationship was recognized by all of decedent's friends, and even by the contestant herself; that it was recognized by others closely associated with her is shown by the fact that when the decedent was in the extremity of her last illness, at the home of John Murray, Murray telegraphed to Smith to come at once to his home; Smith came from Massachusetts to Philadelphia, where he was met and taken by Murray to his home at Collingswood, New Jersey, at which place the decedent subsequently died; Smith was a guest at this house until after the death and funeral. From the testimony, it is shown that the decedent had told Smith that he was mentioned in her will as sole beneficiary. It appeared that, on Feb. 24, 1923, decedent had executed a will at the West Philadelphia Title and Trust Company, naming Platt D. Smith as sole residuary legatee; this fact apparently was known to certain of decedent's relatives and friends. There is no testimony showing that Smith in any manner whatsoever induced or even suggested that the decedent make him a beneficiary under her will. He testified he knew nothing about the execution of the present will.

The other residuary legatee, Mack G. Britton, formerly a wireless operator in the United States Navy, first met the decedent in December, 1924, at a meeting of the Home Service League at the home of Mrs. Hess, hereinbefore referred to. Following this meeting, a close and intimate friendship ensued. However, Britton left for Europe on June 13, 1925, but corresponded with the decedent frequently from that time to the date of her death. Britton testified he knew nothing whatever about her financial affairs, and that the first intimation (page 83) he had ever had that decedent had drawn a will was in May of 1926, when he was abroad in the United States service. This notification consisted of a copy of the citation served upon him under order of this court; this was the first time that he ever knew that the decedent had left a will and that he, Britton, was beneficially interested.

Great stress is laid by the contestant upon letters written by Britton to the decedent. It is claimed that it is clearly apparent from the wording of the said letters that they were written designedly and with intent to ingratiate himself into decedent's affections, and thus unduly influence her in the making of her will. I have read these letters most carefully and find that certainly no such result can be fairly inferred therefrom. There is no other testimony than the letters themselves to sustain a charge of undue influence on the part of Britton. In my opinion, it is wholly insufficient to support such an allegation.

While perhaps the letters were unusual, nevertheless, they may be fairly interpreted as letters one might naturally expect, under all the facts and circumstances. Decedent was acting as a mother toward him, and he found comfort in her interest and affection. Nothing beyond this can be fairly attributed to them.

The present will, the basis of the contest, was typewritten by Ida M. Hudson, the executrix named therein. Mrs. Hudson testified that it was written at the request of decedent; that the decedent had told her that she had requested the West Philadelphia Title and Trust Company to return to her the will of 1923, but that instead of doing so, the trust company had merely given her a carbon copy thereof; the decedent was dissatisfied and did not wish to again go back to the trust company. Decedent took the carbon copy (which was offered in evidence) and crossed out and redrafted the same, and signed a corrected copy thereof, wherein she directed that her

Jacobs's Estate.

residuary estate should be divided between Platt D. Smith and Mack G. Britton. The witness testified that she had typewritten the new will from the carbon copy of the old will as corrected, and, after the instrument was completed, returned it to the decedent in her bedroom and left it with her. When the question of witnesses arose, Mrs. Hudson suggested that the decedent call upon her pastor or some one in the church for such purpose. The decedent asked Mrs. Hudson if she would not come back in a few days, and when Mrs. Hudson did come back, the decedent said (page 98), "I have had Mr. and Mrs. Ward as witnesses to my will." Mrs. Hudson said that the will had then been given to her, and that she had kept it until decedent's death. Mr. and Mrs. Ward testified that they had witnessed a paper, which they now say they did not know was a will. I observe, however, that before the Register of Wills both of them qualified as witnesses to the will, and swore that at the time of the execution they believed the decedent to be of sound and disposing mind, memory and understanding. The credibility of Mrs. Hudson was attacked because her husband had been a creditor of decedent, and that his estate and Mrs. Hudson had been a creditor of decedent, and that his estate and Mrs. Hudson had both been exonerated of the debt by the decedent. However, I do not think that the circumstances surrounding this matter affect the question in issue. Mrs. Hudson was a close personal friend of the decedent and told many things concerning decedent's family relationship. The contestant feels that the decedent was unduly influenced in the making of this will to her detriment. Unfortunately for the contestant, the incident testified to by Mrs. Hudson, and subsequently corroborated by the contestant and her daughter themselves, clearly demonstrated the friction which existed between the decedent and the contestant. It appears that in 1921 the decedent visited the contestant and remained with her for some twenty-one or twenty-two weeks at her home at Columbia, Pennsylvania. While there, contestant noticed that the decedent was greatly disturbed about the actions of Virgil Aurand, hereinbefore referred to, and that late at night she heard decedent praying, and also said that she was constantly writing letters to Aurand. The daughter of contestant, a Mrs. Meta Stamer, took a very active interest in the affairs of her aunt, and advised her mother, the contestant, as to what she should do. Mrs. Stamer, without any justification, secured possession of two letters, written and addressed to Virgil Aurand by the decedent, and kept them; decedent was in great mental anguish because she had not received any answer to the letters; both of these letters contestant and her daughter strongly disapproved, and they have been offered in evidence to show the mental state of the decedent and her susceptibility to undue influence. When the decedent subsequently learned that the letters were intercepted, it caused a family disturbance, and the decedent never again visited her sister. It is also to be noted that Mrs. Stamer, to further bolster up a possible will contest, interviewed decedent's doctor in order to ascertain whether or not, in his opinion, the decedent was of sound mind. Such actions naturally caused hard feelings between the decedent and the contestant, and, in my opinion, counts in large measure for the absence of a more cordial relationship between them. It is also to be noted that the contestant borrowed certain moneys from the decedent, secured by mortgage, on which she has been regularly paying the interest. It has not been shown that there was any close family relationship between the decedent and any other of her relatives, except Mr. Murray, hereinbefore referred to. Unquestionably Mr. Murray (a man of very high type, who impressed me very much) was most disinterested in looking after the decedent's business affairs and did much to

make her comfortable and happy. He testified in a very straightforward manner, but was well aware of the attachment of the decedent to Mr. Smith. This witness telegraphed to Mr. Smith and entertained him. He testified (page 37): "I think she loved Platt Smith as a woman would love her own son." Mrs. Price, the mother-in-law of Mr. Murray, testified (page 38) that she knew of the interest of the decedent in her "boys," and was quite willing for the boys to visit the decedent while she was at Mrs. Price's house. Mrs. Murray, the wife-of John Murray, stated that decedent seemed to be normal in everything except for her great fondness for sailor boys. Dr. Blackburn, the attending physician, testified that the cause of death of the decedent was due to a form of cancer on her right thigh. He testified that she discussed business matters with him and seemed normal in every respect, except what he thought was "a peculiar turn of mind" and that it "related to religion, and latterly to sailors." The doctor would not say that she was insane, but that he felt that she was unduly depriving herself of real necessities to give to the church and to do for the church, but that "she knew perfectly well what she was doing at all times."

Mrs. Hess testified as to decedent's interest in the Home Service League and that the decedent was a normal woman, in full possession of her faculties. Miss Anna R. Campbell testified as to the execution of the first will, as did Miss Emma Johns; Anna L. Cault testified concerning the service which decedent rendered as collector of the Home Missionary Society of the church, of which the witness was treasurer. The witness said that all of decedent's accounts were accurately and carefully kept, and that she was a woman of sound and even strong mind. Mrs. Sallie M. James testified concerning the interest of the decedent in the church and in the Home Service League, and that, in her opinion, the testatrix was of sound, disposing mind, memory and understanding. Mrs. Shellmeyer testified that, in her opinion, the decedent was of sound mind. She said "she was very clear in her thinking—probably unusually religious, but to her that was her life. But her thinking was very clear as long as I saw her or whenever I talked to her." The witness said that the decedent was unusually interested in current topics and talked about the affairs of the world in general and that she read a great deal. "We had many interesting conversations. At the time I came home from college, when I thought I knew a great deal, I used to love to get into arguments with her." There was considerable evidence given relative to business relations of the decedent, which invariably demonstrated that the decedent was fully aware of the nature thereof and as to her ability to properly take care of her own affairs.

To constitute undue influence, there must be imprisonment of body or mind, fraud, threats, misrepresentations, inordinate flattery or physical or moral coercion to such a degree as to prejudice the mind of testator and destroy his free agency and operate as a present restraint upon him in the making of the will: Phillips's Estate, 244 Pa. 35.

There must be present the power and will of another which so controls the mind of testator that he is unable to decide for himself, but submits to the desires of the former: Smith's Estate, 250 Pa. 67. See Tetlow's Estate, 269 Pa. 486; Goss's Estate, 274 Pa. 278.

That Britton in his lifetime may have sought financial aid in his letters seems unimportant. Certainly he did not solicit decedent to make a will in his favor. It is held (Englert v. Englert, 198 Pa. 326) that even importunate solicitation is permissible in the absence of fraud, deceit or such domination as subjugates the mind of the decedent. See Leisey's Estate, 280 Pa. 533; Buechley's Estate, 278 Pa. 227.

Respecting testamentary capacity, contestant admits that the decedent had a sound mind in everything except as to religion and her interest in sailor welfare. As to these, it is charged that her interest was so great as to deprive her of a free and deliberative testamentary capacity.

It seems well settled that mere peculiarities of mind, eccentricities, religious enthusiasm or general hobbies were not sufficient to avoid a will: Smith's Estate, 250 Pa. 67; Tetlow's Estate, *supra;* Goss's Estate, *supra.*

As to the measure of testamentary capacity necessary to make a will, see Snyder's Estate, 279 Pa. 63.

Because the decedent chose to make a will in favor of friends in whom she was deeply interested, to the exclusion of her sister and other relatives, does not render the will invalid. As was said in the case of Guarantee Trust Co. *v.* Heidenreich, 290 Pa. 249, at page 257, "a will cannot be successfully challenged because it fails to make distribution according to the intestate laws; in fact, its main object is to withdraw the estate therefrom. It is the duty of the court to protect a citizen's right to dispose of his own property, although he may seem to do so unjustly."

Under all the facts and authorities above enumerated, I have reached the conclusion, and so find, that the contestant has failed to establish testamentary incapacity on the part of the decedent, and has not shown that the said will was obtained by any undue influence. As a chancellor, I find that the evidence as submitted by the contestant would not support a verdict of a jury, even if found in her favor.

I am, therefore, of opinion that no issue should be awarded, and I enter the following

*Decree.*

And now, to wit, Nov. 11, 1927, the appeal is dismissed at the cost of appellant, and the action of the register upheld, and the record is remitted to the register.

*J. A. Keough,* for exceptions; *William H. Peace,* contra.

HENDERSON, J., Dec. 30, 1927.—A careful examination of this record and of the briefs of counsel convinces us that the judge presiding upon this appeal from the register has correctly disposed of the same, and for the reasons given by him.

The exceptions are dismissed and the decree *nisi* is confirmed absolutely.